

FILED

APR 06 2016

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

RECEIVED

APR 06 2016

MAGISTRATE JUDGE
SHEILA M. FINNEGAN

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | ) | | |
| | ) | Case No. | 14 CR 732 |
| vs. | ) | | |
| | ) | | |
| JOSEPHINE TINIMBANG, | ) | Violations: | Title 18, United States |
| RICHARD TINIMBANG, | ) | | Code, Sections 371, 1035, |
| MARIBEL TINIMBANG, | ) | | 1347, 1349, 1546, 1594, |
| JANET GUERRERO, | ) | | and 1956 |
| MONETTE MOJARES, | ) | | |
| SHARON GULLA, | ) | | |
| AVELINA FIEL, | ) | | |
| JOSE CALUB, | ) | | Title 42, United States |
| VIVIAN BALDEMOR, | ) | | Code, Section 1320a- |
| JERILYN DE GUZMAN, | ) | | 7b(b) |
| RONALD MALALIS, and | ) | | |
| MARY PILAR MENDOZA | ) | | |

JUDGE PALLMEYER

### THIRD SUPERSEDING INDICTMENT

#### COUNT ONE

MAGISTRATE JUDGE KIM

The SPECIAL SEPTEMBER 2014 GRAND JURY charges:

1.    At times material to this Indictment:

#### The Medicare Program

a.    The Medicare program was a federal health care program providing benefits to persons who were 65 years of age or older, or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services, a federal agency under the United States Department of Health and Human Services. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

b.    Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

c.      The Medicare program included coverage under two primary components, hospital insurance ("Part A") and medical insurance ("Part B"). Part A of the Medicare program covered the cost of home health care services such as skilled nursing services and physical therapy.

d.      By becoming a participating provider in Medicare, enrolled providers agreed to abide by the policies and procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, were required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies and procedures, rules, and regulations issued by CMS and its authorized agents and contractors. Health care providers were given and provided with online access to Medicare manuals and service bulletins describing proper billing procedures and billing rules and regulations.

e.      Medicare Part A regulations required health care providers enrolled with Medicare to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting the actual treatment of the patients to whom services were provided and on whose behalf claims for payment were submitted. These records were required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of payments made to the health care provider under the Part A program.

f.      Providers could submit claims to Medicare only for services they rendered, and providers were required to maintain patient records to verify that the services were provided as described in claims for payment submitted to Medicare.

2

g.     To receive reimbursement for a covered service from Medicare, a provider was required to submit a claim, either electronically or using a form, containing the required information appropriately identifying the provider, patient, and services rendered.

h.     A home health agency was an entity that provided health care services to Medicare beneficiaries in their homes. Home health care services included but were not limited to skilled nursing services and physical therapy. Medicare covered home health care services when beneficiaries needed skilled care and were homebound.

i.     Home health care services were billed to Medicare in 60-day periods known as episodes of care. Medicare reimbursed home health care companies at a higher level for the episode when more services were provided.

j.     For a beneficiary to be eligible to receive home health care services covered by Medicare, a physician was required to certify that the patient needed skilled care and was homebound. In addition, the home health agency was required to provide the beneficiary with a comprehensive assessment of the beneficiary's health status, as conducted by a registered nurse. The registered nurse was required to independently assess the beneficiary's homebound status.

k.     The comprehensive assessment required by Medicare was also referred to as the Outcome and Assessment Information Set, or OASIS. The health information collected during the comprehensive assessment was required to be reported to Medicare, and Medicare used the information to calculate the amount the home health agency would be paid for the episode of care. Medicare paid the home health agency more for an episode of care when the comprehensive assessment indicated the beneficiary's clinical condition was more severe.

3

l.     Federal law prohibited physicians who received compensation from a home health care company from referring patients to that company for home health care services. Such physicians were expressly prohibited from supplying home health certifications, or establishing or reviewing the home health plan of treatment, for any patient of the home health care company from which the physician received compensation.

### Defendants and The Companies

m.     Donnarich Home Health Care, Inc. was a home health care company enrolled in Medicare that purported to provide home health care services to patients in their homes. Donnarich was located in Lincolnwood, Illinois.

n.     Josdan Home Health Care Inc. was a home health care company enrolled in Medicare that purported to provide home health services to patients in their homes. Josdan was located in Lincolnwood, Illinois.

o.     Pathways Home Health Services LLC was a home health care company enrolled in Medicare that purported to provide home health services to patients in their homes. Pathways was located in Lincolnwood, Illinois.

p.     Skilled Resource Network was a corporation registered in the state of Illinois. The entity and its bank accounts were funded by deposits from Josdan and Pathways and used by JOSEPHINE TINIMBANG, RICHARD TINIMBANG, and others.

q.     Patients First Physical Therapy Inc. ("PFPT") was a corporation registered in the state of Illinois. PFPT purported to provide in-home physical therapy services to the patients of Donnarich, Josdan, and Pathways.

r.      6420 N. Longmeadow, LLC was a limited liability company registered in the state of Illinois. The entity's members were relatives of JOSEPHINE TINIMBANG, including but not limited to RICHARD TINIMBANG.

s.      All In One Marketing Agency Inc. was a corporation registered in the state of Illinois and located in Hammond, Indiana.

t.      JOSEPHINE TINIMBANG, a resident of Cook County, Illinois until approximately June 2012, was an owner and operator of Donnarich, Josdan, and Pathways.

u.      RICHARD TINIMBANG, a resident of Cook County, Illinois, was the son of JOSEPHINE TINIMBANG and an owner of PFPT. RICHARD TINIMBANG participated in directing the day-to-day operations of Donnarich, Josdan, and Pathways.

v.      MARIBEL BACALAN TINIMBANG, a resident of Cook County, Illinois, was the wife of RICHARD TINIMBANG, an owner of PFPT, and a physical therapist licensed in the state of Illinois.

w.      JANET GUERRERO, a resident of Cook County, Illinois, was the Office Manager of Josdan and was listed as the owner of Pathways.

x.      MONETTE MOJARES, a resident of Cook County, Illinois, was a registered nurse who worked as a director of quality assurance and a director of nursing at Josdan.

y.      SHARON GULLA, a resident of Cook County, Illinois, was a registered nurse who worked as a director of nursing at Josdan and a quality assurance supervisor at Pathways.

z.      AVELINA FIEL, a resident of Lake County, Illinois, was a registered nurse who worked as a director of nursing at Pathways.

5

aa.     JOSE CALUB, a resident of Cook County, Illinois, was the medical director of Donnarich, Josdan, and Pathways. He was a licensed physician who certified Medicare beneficiaries as eligible to receive home health services.

bb.     Sherwin Cubelo, a resident of Lake County, Indiana, was the President of All In One Marketing. He recruited Medicare beneficiaries for Donnarich, Josdan, and Pathways.

cc.     VIVIAN BALDEMOR, a resident of Cook County, Illinois, was a registered nurse employed by Hospital A. She recruited Medicare beneficiaries for Donnarich, Josdan, and Pathways.

dd.     JERILYN DE GUZMAN, a resident of Cook County, Illinois, was a registered nurse who enrolled beneficiaries in home health services at Josdan.

ee.     Marilou Lozano, a resident of Cook County, Illinois, was a registered nurse who enrolled beneficiaries in home health services at Josdan and Pathways.

ff.     RONALD MALALIS, a resident of Cook County, Illinois, was a registered nurse who enrolled beneficiaries in home health services at Josdan and Pathways.

gg.     MARY PILAR MENDOZA, a resident of Cook County, Illinois, was a registered nurse who enrolled beneficiaries in home health services at Pathways.

hh.     Isabelita Sabejon, a resident of Cook County, Illinois, was a registered nurse who enrolled beneficiaries in home health services at Josdan and Pathways.

2.     From in or around January 2008 and continuing through in or around March 2014, at Cook County, in the Northern District of Illinois, and elsewhere,

JOSEPHINE TINIMBANG,
RICHARD TINIMBANG,
MARIBEL TINIMBANG,

6

JANET GUERRERO,
MONETTE MOJARES,
SHARON GULLA,
AVELINA FIEL,
JOSE CALUB,
JERILYN DE GUZMAN,
RONALD MALALIS, and
MARY PILAR MENDOZA

defendants herein, did conspire with each other and others, known and unknown to the Grand Jury:

           a.        to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

           b.        to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations and promises were false and fraudulent when made, and did knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## **Purpose of the Conspiracy**

3.      It was a purpose of the conspiracy for JOSEPHINE TINIMBANG, RICHARD TINIMBANG, MARIBEL TINIMBANG, JANET GUERRERO, MONETTE MOJARES, SHARON GULLA, AVELINA FIEL, JOSE CALUB, Sherwin Cubelo, JERILYN DE GUZMAN, Marilou Lozano, RONALD MALALIS, MARY PILAR MENDOZA, Isabelita Sabejon, and others to unlawfully enrich themselves and others by, among other things, submitting and causing the submission of false and fraudulent claims to Medicare, and diverting proceeds of the fraud for the personal use and benefit of the defendants and their co-conspirators.

## **Manner and Means**

### Medicare Beneficiaries Obtained Through Unlawful Bribes and Kickbacks

4.      It was part of the conspiracy that JOSEPHINE TINIMBANG, RICHARD TINIMBANG, and others caused VIVIAN BALDEMOR, Sherwin Cubelo, and others to supply Donnarich, Josdan, and Pathways with the names and contact information of Medicare beneficiaries who did not qualify for home health care services because they were not homebound and did not need skilled care.

5.      It was further part of the conspiracy that JOSEPHINE TINIMBANG, RICHARD TINIMBANG, JANET GUERRERO, and others made bribe and kickback payments to VIVIAN BALDEMOR, Sherwin Cubelo, and others so that they would supply Medicare beneficiaries to Donnarich, Josdan, and Pathways.

6.      It was further part of the conspiracy that JOSEPHINE TINIMBANG and RICHARD TINIMBANG caused JANET GUERRERO and others to keep track of the beneficiaries referred to Donnarich, Josdan, and Pathways by BALDEMOR, Cubelo, and others.

8

7.      It was further part of the conspiracy that JOSEPHINE TINIMBANG caused JANET GUERRERO and others to calculate the bribe and kickback payments that BALDEMOR, Cubelo, and others were owed in exchange for referring Medicare beneficiaries to Donnarich, Josdan, and Pathways.

8.      It was further part of the conspiracy that JOSEPHINE TINIMBANG, RICHARD TINIMBANG, JANET GUERRERO, SHARON GULLA, AVELINA FIEL, and others arranged for and caused others to arrange for home health services for the beneficiaries referred by VIVIAN BALDEMOR, Sherwin Cubelo and others, knowing that such beneficiaries did not need home health care and were not qualified for home health care because they were not homebound.

### Beneficiaries Enrolled in Home Health Care Regardless of Qualifications or Need

9.      It was further part of the conspiracy that JOSEPHINE TINIMBANG, JANET GUERRERO, and others communicated with Sherwin Cubelo and other referral sources when the beneficiaries those sources referred to Donnarich, Josdan, and Pathways refused services, so that Cubelo and others could contact the beneficiaries and persuade them to enroll in home health care.

10.     It was further part of the conspiracy that at times, Sherwin Cubelo paid the beneficiaries he referred to Donnarich, Josdan, and Pathways to induce them to agree to accept home health care services.

11.     It was further part of the conspiracy that JOSEPHINE TINIMBANG, RICHARD TINIMBANG, JANET GUERRERO, MONETTE MOJARES, SHARON GULLA, AVELINA FIEL, JOSE CALUB, JERILYN DE GUZMAN, Marilou Lozano, RONALD MALALIS, MARY PILAR MENDOZA, Isabelita Sabejon, and others enrolled and caused to be enrolled

9

Medicare beneficiaries in home health care at Donnarich, Josdan, and Pathways even though they were aware that the beneficiaries did not need or qualify for the care, causing Medicare to pay Donnarich, Josdan, and Pathways for home health care services that were not medically necessary and were not provided.

<u>Medical Records Falsified Upon Beneficiaries' Enrollment</u>

12.　　It was further part of the conspiracy that JERILYN DE GUZMAN, Marilou Lozano, RONALD MALALIS, MARY PILAR MENDOZA, Isabelita Sabejon, and others falsified information in medical records, including but not limited to OASIS forms, to make it appear that beneficiaries were homebound and qualified for home health care services when in fact they were not homebound and did not qualify.

13.　　It was further part of the conspiracy that JERILYN DE GUZMAN, Marilou Lozano, RONALD MALALIS, MARY PILAR MENDOZA, Isabelita Sabejon, and others falsified information in medical records, including but not limited to OASIS forms, to make it appear that beneficiaries were sicker than they truly were, and needed assistance that they did not in fact need, so that Medicare would pay more money to the home health care companies.

14.　　It was further part of the conspiracy that MONETTE MOJARES, SHARON GULLA, AVELINA FIEL, and others instructed nurses and others to falsify information in medical records, including but not limited to OASIS forms and forms 485, to make it appear that beneficiaries were homebound and qualified for home health care services when in fact they were not homebound and did not qualify.

15.　　It was further part of the conspiracy that MONETTE MOJARES forged signatures on medical records, including but not limited to forms 485 and physician orders, to

make it appear that beneficiaries were homebound and qualified for home health care services when in fact they were not homebound and did not qualify.

## Medicare Beneficiaries Falsely Certified as Homebound

16.     It was further part of the conspiracy that JOSE CALUB would be paid a salary by Donnarich, Josdan, and Pathways, and would also bill Medicare and cause Medicare to be billed for visiting beneficiaries and certifying and re-certifying them as homebound and eligible to receive home health care when they were in fact not homebound and not eligible to receive home health care.

17.     It was further part of the conspiracy that when JOSE CALUB could not personally bill Medicare for visiting and certifying the patients he enrolled in home health care at Donnarich, Josdan, and Pathways – because some of the patients did not have the pertinent type of Medicare coverage – JOSE CALUB would submit invoices to Donnarich, Josdan, and Pathways, and the three home health companies would pay JOSE CALUB for those patients directly.

18.     It was further part of the conspiracy that JOSEPHINE TINIMBANG, RICHARD TINIMBANG, JANET GUERRERO, SHARON GULLA, AVELINA FIEL, and others ignored the findings of physicians who concluded that beneficiaries were not homebound, were not qualified for home health care, and did not need it; and obtained other physicians, including JOSE CALUB, to certify the beneficiaries as eligible to receive home health care.

## Beneficiaries Subjected to Pre-Planned Discharges and Re-Enrollments

19.     It was further part of the conspiracy that JOSEPHINE TINIMBANG, RICHARD TINIMBANG, MARIBEL TINIMBANG, MONETTE MOJARES, SHARON GULLA, AVELINA FIEL, JOSE CALUB, JERILYN DE GUZMAN, and others subjected Medicare

11

beneficiaries to and caused them to be subjected to a pre-planned schedule of enrollments, discharges, and re-enrollments, such that beneficiaries were discharged from care and re-enrolled in care regardless of whether they qualified for or wanted it.

### Falsified Physical Therapy Records

20.     It was further part of the conspiracy that Patients First Physical Therapy, the company owned by RICHARD TINIMBANG and MARIBEL TINIMBANG, purported to provide physical therapy services to many of the Medicare beneficiaries enrolled in home health care at Donnarich, Josdan, and Pathways.   Many of the beneficiaries enrolled in the physical therapy component of home health care services were not homebound and did not need to receive physical therapy services in their homes.

21.     It was further part of the conspiracy that RICHARD TINIMBANG and MARIBEL TINIMBANG falsified medical records to make it appear that MARIBEL TINIMBANG provided physical therapy services that she did not in fact provide.  On some occasions, RICHARD TINIMBANG and MARIBEL TINIMBANG created medical records that made it appear that MARIBEL TINIMBANG had simultaneously provided physical therapy services to patients who were in different locations.

### Fraudulent Claims Submitted to Medicare

22.     It was further part of the conspiracy that JOSEPHINE TINIMBANG, RICHARD TINIMBANG, MARIBEL TINIMBANG, JANET GUERRERO, MONETTE MOJARES, SHARON GULLA, AVELINA FIEL, JOSE CALUB, Sherwin Cubelo, JERILYN DE GUZMAN, Marilou Lozano, RONALD MALALIS, MARY PILAR MENDOZA, Isabelita Sabejon, and others caused Donnarich, Josdan, and Pathways to submit claims to Medicare for services that were not medically necessary and were never provided, and caused Medicare to

12

make more than $60 million in payments for home health care services, at least $45 million of which were fraudulent.

23.     It was further part of the conspiracy that JOSEPHINE TINIMBANG, RICHARD TINIMBANG, MARIBEL TINIMBANG, JANET GUERRERO, and others would transfer and disburse, and cause the transfer and disbursement of, funds from the various bank accounts of Donnarich, Josdan, and Pathways, and from secondary bank accounts that were funded by Donnarich, Josdan, and Pathways, to themselves and others.

24.     It was further part of the conspiracy that JOSEPHINE TINIMBANG, RICHARD TINIMBANG, MARIBEL TINIMBANG, JANET GUERRERO, and others would cause the proceeds of the fraud to be used to purchase assets for the benefit of JOSEPHINE TINIMBANG, RICHARD TINIMBANG, MARIBEL TINIMBANG, and others, including but not limited to assets such as investment accounts, shares of stock, vehicles, real estate, and jewelry.

25.     It was further part of the conspiracy that the defendants and others misrepresented, concealed, hid, and caused to be misrepresented, concealed, and hidden, the purpose of the conspiracy and acts done in furtherance of the conspiracy.

All in violation of Title 18, United States Code, Section 1349.

13

## COUNTS TWO THROUGH EIGHT

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.     The allegations of Paragraph 1(a) to 1(o), 1(t), 1(x), 1(aa), and 1(ff) of Count One of this Indictment are incorporated here.

2.     From in or around January 2008 and continuing through in or around March 2014, at Cook County, in the Northern District of Illinois, and elsewhere,

JOSEPHINE TINIMBANG,
MONETTE MOJARES,
JOSE CALUB, and
RONALD MALALIS,

defendants herein, participated in a scheme to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, which scheme is further described below.

3.     It was part of the scheme that JOSEPHINE TINIMBANG, MONETTE MOJARES, JOSE CALUB, Marilou Lozano, RONALD MALALIS, Isabelita Sabejon, and others enrolled and caused to be enrolled Medicare beneficiaries in home health care at Josdan and Pathways even though they were aware that the beneficiaries did not need or qualify for the care, causing Medicare to pay Donnarich, Josdan, and Pathways for home health care services that were not medically necessary and were not provided.

4.     It was further part of the scheme that MONETTE MOJARES, Marilou Lozano, RONALD MALALIS, Isabelita Sabejon, and others falsified and caused to be falsified

14

information in medical records, including but not limited to OASIS forms and forms 485, to make it appear that beneficiaries were homebound and qualified for home health care services when in fact they were not homebound and did not qualify.

5.     It was further part of the scheme that MONETTE MOJARES, Marilou Lozano, RONALD MALALIS, Isabelita Sabejon, and others falsified and caused to be falsified information in medical records, including but not limited to OASIS forms, to make it appear that beneficiaries were sicker than they truly were, and needed assistance that they did not in fact need, so that Medicare would pay more money to the home health care companies.

6.     It was further part of the scheme that MONETTE MOJARES forged signatures on medical records, including but not limited to forms 485 and physician orders, to make it appear that beneficiaries were homebound and qualified for home health care services when in fact they were not homebound and did not qualify.

7.     It was further part of the scheme that JOSE CALUB would be paid a salary by Donnarich, Josdan, and Pathways, and would also bill Medicare and cause Medicare to be billed for visiting beneficiaries and certifying and re-certifying them as homebound and eligible to receive home health care when they were in fact not homebound and not eligible to receive home health care.

8.     It was further part of the scheme that when JOSE CALUB could not personally bill Medicare for visiting and certifying the patients he enrolled in home health care at Donnarich, Josdan, and Pathways – because some of the patients did not have a pertinent type of Medicare coverage – JOSE CALUB would submit invoices to Donnarich, Josdan, and Pathways, and the three home health companies would pay JOSE CALUB for those patients directly.

15

9.     It was further part of the scheme that JOSEPHINE TINIMBANG, MONETTE MOJARES, JOSE CALUB, Marilou Lozano, RONALD MALALIS, Isabelita Sabejon, and others caused Donnarich, Josdan, and Pathways to submit claims to Medicare for services that were not medically necessary, and caused Medicare to make more than $60 million in payments for home health care services, at least $45 million of which were fraudulent.

10     It was further part of the scheme that JOSEPHINE TINIMBANG and others transferred and disbursed, and caused to be transferred and disbursed, funds from the various bank accounts of Donnarich, Josdan, and Pathways, and from secondary bank accounts that were funded by Donnarich, Josdan, and Pathways, to themselves and others.

11.     It was further part of the conspiracy that JOSEPHINE TINIMBANG and others would cause the proceeds of the fraud to be used to purchase assets for the benefit of JOSEPHINE TINIMBANG and others, including but not limited to assets such as investment accounts, shares of stock, vehicles, real estate, and jewelry.

12.     It was further part of the scheme that JOSEPHINE TINIMBANG and others concealed and hid, and caused to be concealed and hidden, the acts done and the purpose of the acts done as part of the scheme.

13.     On or about the dates enumerated below, in the Northern District of Illinois and elsewhere,

JOSEPHINE TINIMBANG,
MONETTE MOJARES,
JOSE CALUB, and
RONALD MALALIS

defendants herein, did knowingly and willfully execute, and attempt to execute, the above described scheme, as follows:

16

| Count | Defendant | Medicare Ben'y | Purported Dates of Service | Date Billed | Items Billed | Amount Paid by Medicare |
|---|---|---|---|---|---|---|
| 2 | J. TINIMBANG CALUB | L.B. | 3/16/2012 – 5/13/2012 | 6/18/2012 | Home Health Episode of Care (Pathways) | $2,487.62 |
| 3 | J. TINIMBANG CALUB | L.B. | 3/16/2012 | 8/28/2012 | G0179 Home Health Recertification | $34.92 |
| 4 | J. TINIMBANG MOJARES CALUB | M.C. | 6/21/2012 – 8/19/2012 | 9/6/2012 | Home Health Episode of Care (Josdan) | $1,661.34 |
| 5 | J. TINIMBANG CALUB | M.C. | 6/21/2012 | 7/19/2012 | G0180 Home Health Certification | $45.10 |
| 6 | J. TINIMBANG | J.R. | 10/20/2011 – 12/18/2011 | 1/20/2012 | Home Health Episode of Care (Pathways) | $3,820.49 |
| 7 | J. TINIMBANG MOJARES MALALIS | L.B. | 1/5/2011 – 3/2/2011 | 4/5/2011 | Home Health Episode of Care (Josdan) | $2,475.61 |
| 8 | J. TINIMBANG | P.H. | 2/6/2012 – 4/5/2012 | 5/23/2012 | Home Health Episode of Care (Pathways) | $2,043.93 |

All in violation of Title 18, United States Code, Section 1347.

## COUNT NINE

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.     The allegations of Paragraph 1(a) to 1(o), 1(x), and 1(ff) of Count One of this Indictment are incorporated here.

2.     On or about the dates set forth in the table below, in the Northern District of Illinois, Eastern Division, and elsewhere,

MONETTE MOJARES and
RONALD MALALIS

defendants herein, did knowingly and willfully make and cause to be made a materially false, fictitious, and fraudulent statement and representation, and make and cause to be made a materially false writing and document, knowing the same to contain a materially false, fictitious, and fraudulent statement and entry, in a matter involving a health care benefit program, that is, Medicare, in connection with payment for healthcare benefits, items, and services, by causing to be submitted claims containing fabricated information, including information that made it appear that beneficiaries were homebound and sicker than they actually were, namely:

| Count | Defendant | Medicare Ben'y | Purported Dates of Service | Date Billed | Items Billed | Amount Paid by Medicare |
|-------|-----------|----------------|---------------------------|-------------|--------------|-------------------------|
| 9 | MOJARES MALALIS | L.B. | 1/5/2011 – 3/2/2011 | 4/5/2011 | Home Health Episode of Care (Josdan) | $2,475.61 |

All in violation of Title 18, United States Code, Section 1035(a)(2).

## COUNT TEN

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.     The allegations of Paragraph 1(a) to 1(p), 1(s) to 1(u), 1(t), and 1(cc) of Count One of this Indictment are incorporated here.

2.     From in or around 2006 and continuing through in or around March 2014, at Cook County, in the Northern District of Illinois, and elsewhere,

> JOSEPHINE TINIMBANG,
> RICHARD TINIMBANG,
> JANET GUERRERO, and
> VIVIAN BALDEMOR,

defendants herein, together with others known and unknown to the Grand Jury, did conspire:

a.     to knowingly and willfully offer and pay any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, from defendants JOSEPHINE TINIMBANG, RICHARD TINIMBANG, JANET GUERRERO, and others, to Sherwin Cubelo, defendant VIVIAN BALDEMOR, and others, to induce the referral of patients to Donnarich, Josdan, and Pathways for the furnishing and arranging for the furnishing of services for which payment may be made in whole or in part under a Federal health care program, namely, Medicare, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A); and

b.     to knowingly and willfully solicit and receive any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, from defendants JOSEPHINE TINIMBANG, RICHARD TINIMBANG, JANET GUERRERO, and others, to Sherwin Cubelo, defendant VIVIAN BALDEMOR, and others, in return for referring patients to Donnarich, Josdan, and Pathways for the furnishing and arranging for the furnishing of services for which payment may be made in whole or in part under a Federal health care program, namely,

19

Medicare, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A).

### Purpose of the Conspiracy

3.    It was a purpose of the conspiracy for JOSEPHINE TINIMBANG, RICHARD TINIMBANG, JANET GUERRERO, VIVIAN BALDEMOR, Sherwin Cubelo, and others to unlawfully enrich themselves and others by, among other things, making and receiving unlawful payments to obtain Medicare beneficiaries whose home health care services could be billed to Medicare, and diverting proceeds of the unlawful payments for the personal use and benefit of the defendants and their co-conspirators.

### Manner and Means

4.    It was part of the conspiracy that defendants and their co-conspirators agreed to unlawfully enrich themselves and others by (i) offering, paying, soliciting, and receiving bribe and kickback payments in return for referring Medicare beneficiaries to Donnarich, Josdan, and Pathways to serve as home health patients, (ii) using the referred beneficiary information to obtain payments from Medicare for home health services purportedly provided by Donnarich, Josdan, and Pathways, and (iii) concealing the offer, solicitation, payment, and receipt of the bribes and kickbacks.

5.    It was further part of the conspiracy that JOSEPHINE TINIMBANG, RICHARD TINIMBANG, JANET GUERRERO, and others offered and paid bribes and kickbacks on behalf of Donnarich, Josdan, and Pathways to Sherwin Cubelo, VIVIAN BALDEMOR, and others in return for the referral of Medicare beneficiaries to Donnarich, Josdan, and Pathways for home health services paid by Medicare.

6.    It was further part of the conspiracy that Sherwin Cubelo, VIVIAN BALDEMOR, and others solicited and received bribes and kickbacks from JOSEPHINE TINIMBANG,

20

RICHARD TINIMBANG, JANET GUERRERO, and others in exchange for referring Medicare beneficiaries to Donnarich, Josdan, and Pathways for home health services paid for by Medicare.

7.     It was further part of the conspiracy that JOSEPHINE TINIMBANG, RICHARD TINIMBANG, Sherwin Cubelo, and others created and caused to be created corporate entities and bank accounts that were used for the purpose of paying and receiving unlawful bribes and kickbacks.

8.     It was further part of the conspiracy that, in exchange for bribe and kickback payments, Sherwin Cubelo, VIVIAN BALDEMOR, and others referred to Donnarich, Josdan, and Pathways certain Medicare beneficiaries, knowing that such beneficiaries were not homebound.

9.     It was further part of the conspiracy that JOSEPHINE TINIMBANG, RICHARD TINIMBANG, JANET GUERRERO, and their co-conspirators submitted to Medicare, and caused to be submitted to Medicare, claims for home health services purportedly provided to the beneficiaries referred to Donnarich, Josdan, and Pathways by Sherwin Cubelo, VIVIAN BALDEMOR, and others.

10.     It was further part of the conspiracy that JOSEPHINE TINIMBANG, RICHARD TINIMBANG, JANET GUERRERO, and their co-conspirators falsely represented to Medicare and caused to be falsely represented to Medicare that patients were referred to Donnarich, Josdan, and Pathways by physicians, when in fact patients were referred by non-medical professionals who received unlawful bribes and kickbacks.

11.     It was further part of the conspiracy that JOSEPHINE TINIMBANG, RICHARD TINIMBANG, JANET GUERRERO, and their co-conspirators caused Medicare to pay Donnarich, Josdan, and Pathways millions of dollars based upon claims submitted for home

health care services purportedly provided to Medicare beneficiaries referred by Sherwin Cubelo, VIVIAN BALDEMOR, and others.

12.     It was further part of the conspiracy that JOSEPHINE TINIMBANG, RICHARD TINIMBANG, JANET GUERRERO, VIVIAN BALDEMOR, Sherwin Cubelo, and their co-conspirators misrepresented, concealed, hid, and caused to be misrepresented, concealed, and hidden, the purpose of the conspiracy and acts done in furtherance of the conspiracy.

<b>Overt Acts</b>

13.     In furtherance of and to effect the objects of the conspiracy, the defendants committed and caused to be committed, in the Northern District of Illinois, at least one of the following overt acts, among others:

14.     The registration of corporate entities including but not limited to Skilled Resource Network and All In One Marketing Agency.

15.     The creation and execution of "independent contractor" agreements which falsely stated that patient recruiters provided "consulting" and "community benefit" services when in fact the only thing they did was supply Medicare beneficiaries.

16.     The following bribe and kickback transactions:

| Defendant | Approx. Date | Payment Amount | Company on Check |
|---|---|---|---|
| J. TINIMBANG BALDEMOR | 3/21/2007 | $3,000 | Donnarich |
| R. TINIMBANG | 5/30/2008 | $1,000 | Donnarich |
| J. TINIMBANG | 7/21/2008 | $1,000 | Donnarich |
| R. TINIMBANG | 4/9/2009 | $2,400 | Donnarich |
| J. TINIMBANG BALDEMOR | 6/10/2009 | $1,000 | N/A (cash) |

| | | | |
|---|---|---|---|
| J. TINIMBANG BALDEMOR | 11/21/2009 | $1,000 | N/A (cash) |
| J. TINIMBANG | 11/30/2009 | $500 | Josdan |
| J. TINIMBANG | 2/22/2010 | $600 | Josdan |
| R. TINIMBANG | 3/10/2010 | $600 | Josdan |
| J. TINIMBANG BALDEMOR | 7/21/2010 | $4,000 | N/A (cash) |
| J. TINIMBANG | 7/9/2010 | $2,900 | Skilled Resource Network |
| J. TINIMBANG GUERRERO | 7/23/2010 | $1,200 | Skilled Resource Network |
| J. TINIMBANG R. TINIMBANG | 7/30/2010 | $4,200 | Skilled Resource Network |
| R. TINIMBANG | 12/7/2010 | $900 | Skilled Resource Network |

17.     The bribe and kickback transactions charged in Counts Eleven through Twenty-

Six of this Indictment, each of which constitutes an overt act in furtherance of the conspiracy:

| Defendant | Approx. Date | Payment Amount | Company on Check |
|---|---|---|---|
| J. TINIMBANG | 3/21/2011 | $6,500 | Skilled Resource Network |
| J. TINIMBANG | 4/11/2011 | $1,000 | N/A (cash) |
| J. TINIMBANG | 6/7/2011 | $1,000 | N/A (cash) |
| J. TINIMBANG | 9/16/2011 | $6,000 | Pathways |
| J. TINIMBANG | 9/16/2011 | $6,000 | Pathways |
| R. TINIMBANG | 11/11/2011 | $4,538.46 | Pathways |
| R. TINIMBANG | 11/11/2011 | $4,538.46 | Pathways |
| GUERRERO | 12/23/2011 | $5,538.46 | Pathways |
| J. TINIMBANG | 1/20/2012 | $5,538.46 | Pathways |

| GUERRERO | 2/3/2012 | $5,538.46 | Pathways |
| J. TINIMBANG GUERRERO | 8/8/2012 | $6,000 | N/A (cash) |
| J. TINIMBANG GUERRERO | 12/20/2012 | $1,000 | N/A (cash) |

In violation of Title 18, United States Code, Section 371.

## COUNTS ELEVEN THROUGH TWENTY-TWO

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.     The allegations of Paragraph 1(a) to 1(p), 1(s) to 1(u), and 1(w) of Count One, and the allegations of Count Ten of this Indictment, are incorporated here.

2.     On or about the dates set forth below, in the Northern District of Illinois, Eastern Division, and elsewhere,

JOSEPHINE TINIMBANG,<br>
RICHARD TINIMBANG, and<br>
JANET GUERRERO

defendants herein, as set forth below, did knowingly and willfully offer and pay, directly and indirectly, overtly and covertly, remuneration, to a person to induce the referral of Medicare beneficiaries to Donnarich, Josdan, and Pathways, for the furnishing and arranging for the furnishing of services for which payment may be made in whole or in part under a Federal health care program, namely, Medicare:

| Count | Defendant | Approx. Date | Payment Amount | Company on Check |
|-------|-----------|--------------|----------------|------------------|
| 11 | J. TINIMBANG | 3/21/2011 | $6,500 | Skilled Resource Network |
| 12 | J. TINIMBANG | 4/11/2011 | $1,000 | N/A (cash) |
| 13 | J. TINIMBANG | 6/7/2011 | $1,000 | N/A (cash) |
| 14 | J. TINIMBANG | 9/16/2011 | $6,000 | Pathways |
| 15 | J. TINIMBANG | 9/16/2011 | $6,000 | Pathways |
| 16 | R. TINIMBANG | 11/11/2011 | $4,538.46 | Pathways |
| 17 | R. TINIMBANG | 11/11/2011 | $4,538.46 | Pathways |
| 18 | GUERRERO | 12/23/2011 | $5,538.46 | Pathways |
| 19 | J. TINIMBANG | 1/20/2012 | $5,538.46 | Pathways |

| 20 | GUERRERO | 2/3/2012 | $5,538.46 | Pathways |
| 21 | J. TINIMBANG GUERRERO | 8/8/2012 | $6,000 | N/A (cash) |
| 22 | J. TINIMBANG GUERRERO | 12/20/2012 | $1,000 | N/A (cash) |

In violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A).

## COUNTS TWENTY-THREE THROUGH TWENTY-SIX

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.      The allegations of Paragraph 1(a) to 1(o) and 1(cc) of Count One, and the allegations of Count Ten of this Indictment, are incorporated here.

2.      On or about the dates set forth below, in the Northern District of Illinois, Eastern Division, and elsewhere,

### VIVIAN BALDEMOR,

defendant herein, did knowingly and willfully solicit and receive, directly and indirectly, overtly and covertly, remuneration, as set forth below, in return for referring Medicare beneficiaries to Donnarich, Josdan, and Pathways for the furnishing and arranging for the furnishing of services for which payment may be made in whole or in part under a Federal health care program, namely, Medicare:

| Count | Approximate Date | Amount |
|-------|------------------|--------|
| 23 | 4/11/2011 | $1,000 |
| 24 | 6/7/2011 | $1,000 |
| 25 | 8/8/2012 | $6,000 |
| 26 | 12/20/2012 | $1,000 |

In violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A).

27

## COUNT TWENTY-SEVEN

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.      The allegations of Paragraph 1(a) to 1(p), 1(r), 1(t), and 1(w) of Count One of this Indictment are incorporated here.

2.      Beginning no later than in or around 2008 and continuing to at least in or around 2013, in the Northern District of Illinois, Eastern Division, and elsewhere,

JOSEPHINE TINIMBANG and
JANET GUERRERO,

defendants herein, did conspire with each other and with others known and unknown to the Grand Jury, to knowingly conduct and attempt to conduct a financial transaction involving proceeds of a specified unlawful activity – namely, health care fraud, wire fraud, the payment of unlawful bribes and kickbacks, and conspiracy to commit each of them – knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity, and knowing that the transaction was designed, in whole or in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

### Purpose of the Conspiracy

3.      It was a purpose of the conspiracy for JOSEPHINE TINIMBANG and JANET GUERRERO to unlawfully enrich themselves and others by, among other things, conducting transactions that were designed to conceal and disguise the nature, location, source, ownership, and control of the proceeds of unlawful activity.

28

**Manner and Means**

4.     It was part of the conspiracy that JOSEPHINE TINIMBANG and JANET GUERRERO agreed to unlawfully enrich themselves and others by (i) conducting transactions involving the proceeds of health care fraud, wire fraud, the payment of unlawful bribes and kickbacks, and conspiracy to commit each of them; (ii) designing such transactions, and causing them to be carried out, in such a way that the transactions concealed and disguised the nature, location, source, ownership, and control of the proceeds of unlawful activity; and (iii) using the laundered proceeds to purchase items for the benefit of JOSEPHINE TINIMBANG, JANET GUERRERO, and others.

5.     It was further part of the conspiracy that JOSEPHINE TINIMBANG, JANET GUERRERO, and others attempted to conceal the ownership of Pathways.

6.     It was further part of the conspiracy that JOSEPHINE TINIMBANG, JANET GUERRERO, and others registered and caused to be registered corporate entities with the Illinois Secretary of State that had no real business purpose.

7.     It was further part of the conspiracy that JOSEPHINE TINIMBANG, JANET GUERRERO, and others opened bank accounts that had no real business purpose, and placed such bank accounts under the names of Pathways and other corporate entities.

8.     It was further part of the conspiracy that JOSEPHINE TINIMBANG and JANET GUERRERO opened bank accounts in the name of JANET GUERRERO that were not really used by JANET GUERRERO.

9.     It was further part of the conspiracy that JOSEPHINE TINIMBANG and JANET GUERRERO conducted, and caused to be conducted, financial transactions to move the proceeds of unlawful activity from the bank accounts of Donnarich, Josdan, and Pathways, into

29

bank accounts that were controlled by JOSEPHINE TINIMBANG but not held in the name of JOSEPHINE TINIMBANG.

10. It was further part of the conspiracy that JOSEPHINE TINIMBANG and JANET GUERRERO carried out and caused to be carried out financial transactions using the following duplicitous means, among others:

a. Checks were written out to "cash" but were not really cashed. Instead, the checks were deposited to bank accounts controlled by JOSEPHINE TINIMBANG and others.

b. Checks were written out to JANET GUERRERO but were not really received by JANET GUERRERO. Instead, the checks were deposited to bank accounts controlled by JOSEPHINE TINIMBANG and others.

c. Checks were written out to the name of one corporate entity but were not really deposited to a bank account belonging to that corporate entity. Instead, they were deposited to the account of a different corporate entity controlled by JOSEPHINE TINIMBANG and others.

d. Funds were withdrawn in the form of a cashier's check but the cashier's check was not really remitted to the person or entity on the cashier's check. Instead, the cashier's check was deposited to an account in a different name.

e. Funds were withdrawn in the form of a cashier's check but the cashier's check was never really used. Instead, the cashier's check was exchanged one or more times for different cashier's checks that were placed in the names of different individuals or entities.

11. It was further part of the conspiracy that after duplicitous transactions were conducted, the resulting funds were used to benefit JOSEPHINE TINIMBANG, JANET GUERRERO, their friends, and JOSEPHINE TINIMBANG's family members – through the

acquisition of items including but not limited to investment accounts, shares of stock, vehicles, real estate, and jewelry.

     In violation of Title 18, United States Code, Sections 1956(h) and 2.

## COUNTS TWENTY-EIGHT THROUGH THIRTY

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1. The allegations of Paragraph 1(a) to 1(p), 1(r), and 1(t) of Count One of this Indictment are incorporated here.

2. On or about the dates set forth in the table below, in the Northern District of Illinois, Eastern Division, and elsewhere,

JOSEPHINE TINIMBANG,

defendant herein, knowingly conducted and caused to be conducted the financial transactions listed below, namely, deposits and withdrawals for the purchase of diamond jewelry, in or affecting interstate commerce, each such financial transaction constituting a separate count, which financial transactions involved the proceeds of a specified unlawful activity – namely, health care fraud, wire fraud, the payment of unlawful bribes and kickbacks, and conspiracy to commit each of them – knowing that the financial transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity and, while conducting such financial transactions, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity:

| Count | Amount | Date | Transaction |
|-------|--------|------|-------------|
| 28 | $100,000 | 2/25/2011 (deposit) | Check 1185 drawn on JP Morgan Chase account x0910, made payable to Janet Guerrero but deposited to Skilled Resource Network |

32

| 29 | $15,000 | 3/23/2011 (deposit) | Check 22491 drawn on Bank of America account x5022, made payable to 6420 N. Longmeadow but deposited to Skilled Resource Network |
| 30 | $75,000 | 4/7/2011 | Cashier's check 2005019554, purchased with funds from Skilled Resource Network and made payable to Edward Simonian Inc. |

All in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

## COUNT THIRTY-ONE

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.     The allegations of Paragraph 1(m) to 1(o), 1(q), 1(u), and 1(v) of Count One of this Indictment are incorporated here.

2.     Beginning no later than in or around 2009 and continuing to at least in or around 2013, in the Northern District of Illinois, Eastern Division, and elsewhere,

RICHARD TINIMBANG and
MARIBEL TINIMBANG,

defendants herein, did conspire with each other and with others known and unknown to the Grand Jury, to knowingly conduct and attempt to conduct a financial transaction involving proceeds of a specified unlawful activity – namely, health care fraud, wire fraud, and conspiracy to commit each of them – knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity, and knowing that the transaction was designed, in whole or in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

### Purpose of the Conspiracy

3.     It was a purpose of the conspiracy for RICHARD TINIMBANG and MARIBEL TINIMBANG to unlawfully enrich themselves and others by, among other things, conducting transactions that were designed to conceal and disguise the nature, location, source, ownership, and control of the proceeds of unlawful activity.

34

### Manner and Means

4.      It was part of the conspiracy that RICHARD TINIMBANG and MARIBEL TINIMBANG agreed to unlawfully enrich themselves and others by (i) conducting transactions involving the proceeds of health care fraud, wire fraud, and conspiracy to commit each of them; (ii) designing such transactions, and causing them to be carried out, in such a way that the transactions concealed and disguised the nature, location, source, ownership, and control of the proceeds of unlawful activity; and (iii) using the laundered proceeds to purchase items for the benefit of RICHARD TINIMBANG, MARIBEL TINIMBANG, and others.

5.      It was further part of the conspiracy that RICHARD TINIMBANG and MARIBEL TINIMBANG opened and used a bank account in the name of Patients First Physical Therapy.

6.      It was further part of the conspiracy that RICHARD TINIMBANG and MARIBEL TINIMBANG opened and used numerous personal bank accounts.

7.      It was further part of the conspiracy that RICHARD TINIMBANG and MARIBEL TINIMBANG wrote more than one hundred checks to "cash" from the PFPT bank account.

8.      It was further part of the conspiracy that some of the checks that RICHARD TINIMBANG and MARIBEL TINIMBANG wrote out to "cash" purported to be for business expenses such as "medical supplies" or "office equipment," among others.

9.      It was further part of the conspiracy that most of the checks that RICHARD TINIMBANG and MARIBEL TINIMBANG wrote out to "cash" were not cashed, and were not used for business expenses. Instead, most of the checks were deposited to the personal accounts of RICHARD TINIMBANG and MARIBEL TINIMBANG.

35

10.     It was further part of the conspiracy that the laundered funds were used to purchase items for the personal use of RICHARD TINIMBANG, MARIBEL TINIMBANG, and others, with such items including but not limited to a 5,000-square-foot residence in Lincolnwood, Illinois.

In violation of Title 18, United States Code, Sections 1956(h) and 2.

36

### COUNT THIRTY-TWO

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.      The allegations of Paragraph 1(n) and 1(u) of Count One of this Indictment are incorporated here.

2.      At times material to this Indictment:

        a.      Foreign citizens were only permitted to work inside the United States when they met certain conditions.  One means by which foreign citizens could become authorized to work inside the United States was by obtaining an H-1B visa.

        b.      H-1B visas were only available to individuals who worked in a specialty occupation.  A specialty occupation was one that required the use of a highly specialized body of knowledge, such that a bachelor's degree or higher was needed to work in the occupation in the United States.  Physicians and engineers are common examples of individuals who worked in a specialty occupation.

        c.      To obtain an H-1B visa, a prospective employer was required to submit application forms to the United States Department of Labor and the Department of Homeland Security.  The forms submitted to the Department of Homeland Security included the Form I-129, Petition for Nonimmigrant Worker.  The individual who signed the Form I-129 was required to certify under the penalty of perjury that the information contained therein was true and correct to the best of his knowledge.

        d.      Individual A was a citizen of the Philippines who was not authorized to work in the United States.

        e.      On or about September 13, 2011, on behalf of Josdan Home Health Care, defendant RICHARD TINIMBANG filed and caused to be filed a Form I-129 with the United

37

States Department of Homeland Security. The Form I-129 sought authorization for Josdan to employ Individual A as a business analyst earning $50,066 per year. RICHARD TINIMBANG signed the Form I-129 under the penalty of perjury, certifying that the information contained therein was true and correct to the best of his knowledge.

      f.     On or about September 13, 2011, defendant RICHARD TINIMBANG filed and caused to be filed, together with the Form I-129, an H Classification Supplement to Form I-129. The Supplement to Form I-129 asserted that Individual A should be classified as an H-1B beneficiary working in a "specialty occupation."

      g.     Based on the information provided, the Department of Homeland Security approved an H-1B visa for Individual A.

      h.     Individual A subsequently arrived in the United States and reported to work for RICHARD TINIMBANG. Individual A never worked at Josdan and never worked as a business analyst. Instead, Individual A worked as a housekeeper and nanny in the homes of RICHARD TINIMBANG, MARIBEL TINIMBANG, and two other individuals.

      i.     Individual A was not paid an annual salary of $50,066. In fact, Individual A was not paid any compensation at all.

      3.     On or about September 13, 2011, in the Northern District of Illinois, Eastern Division, and elsewhere,

RICHARD TINIMBANG,

defendant herein, did knowingly present and cause to be presented an application and document required by the immigration laws and regulations prescribed thereunder which contained a false statement, subscribed as true as permitted under penalty of perjury under Section 1746 of Title 28, United States Code, with respect to a material fact, namely Form I-129, Petition for a

38

Nonimmigrant Worker, in which defendant certified that (1) Individual A would be employed by Josdan; (2) Individual A would be employed as a business analyst; and (3) Individual A would earn $50,066 per year; each of which statements the defendant then knew to be false.

In violation of Title 18, United States Code, Section 1546.

### COUNT THIRTY-THREE

The SPECIAL SEPTEMBER 2014 GRAND JURY further charges:

1.      The allegations of Paragraph 1(n), 1(u), and 1(v) of Count One, and the allegations of Paragraph 2 of Count Thirty-Two of this Indictment, are incorporated here.

2.      At times material to this Indictment:

      a.      Individual A worked as a housekeeper and nanny in the homes of RICHARD TINIMBANG, MARIBEL TINIMBANG, and two other individuals.

      b.      Individual A was not paid for her work.

      c.      RICHARD TINIMBANG and MARIBEL TINIMBANG attempted to induce Individual A to sign a servitude contract that provided that Individual A would be paid $66 per day – without regard to the number of hours worked – for a period of seven years. The contract further provided that if Individual A quit before the seven years was up, she would be required to pay $25,000 in damages.

      d.      RICHARD TINIMBANG and MARIBEL TINIMBANG attempted to induce Individual A to sign the contract by making threats to Individual A, including but not limited to threats that if Individual A did not surrender her passport and sign the contract, she would be sent back to the Philippines without being paid for the work she had already performed.

3.      Between in or around July 2012 and continuing until in or around September 2012,

RICHARD TINIMBANG and
MARIBEL TINIMBANG,

40

defendants herein, conspired with each other and with others known and unknown to the Grand Jury, to knowingly obtain the labor and services of Individual A by means of: (a) serious harm and threats of serious harm to Individual A and another person; (b) abuse and threatened abuse of law and legal process; and (c) a scheme, plan, and pattern intended to cause Individual A to believe that, if Individual A did not perform such labor and services, Individual A would suffer serious harm and physical restraint, in violation of Title 18, United States Code, Sections 1589(a) and 2;

In violation of Title 18, United States Code, Section and 1594(c).

41

## FORFEITURE ALLEGATIONS

The SPECIAL SEPTEMBER 2014 GRAND JURY further alleges:

1. The allegations contained in Counts One through Twenty-Eight of this Indictment are incorporated here for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 982.

2. Upon conviction of a violation of Title 18, United States Code, Sections 371, 1035, 1343, 1347, or 1349, as alleged in Counts One through Ten of this Indictment; or upon conviction of a violation of Title 42, United States Code, Section 1320a-7b(b), as alleged in Counts Eleven through Twenty-Six of this Indictment, the defendants shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

3. Upon conviction of a violation of Title 18, United States Code, Section 1956, as alleged in Counts Twenty-Seven through Thirty-One of this Indictment, the defendants shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offense and any property traceable to such property.

4. The property to be forfeited includes, but is not limited to, the following:

Money Judgment

a. A forfeiture judgment of at least $45 million.

42

Amounts Seized from Bank Accounts

b.     Six thousand two hundred seven dollars and eighteen cents seized on or about March 5, 2014 from JP Morgan Chase Bank account 805445244, held in the name of Josdan Home Health Care Inc.;

c.     Seven thousand seven hundred ninety dollars and seventy-five cents seized on or about March 5, 2014 from Associated Bank account 2153141631, held in the name of Skilled Resource Network, Inc.;

d.     Eleven thousand five hundred twelve dollars and fifty-five cents seized on or about March 5, 2014 from JP Morgan Chase Bank account 858450851, held in the name of Pathways Home Health Services;

e.     Eighty-three thousand four hundred ninety-six dollars and thirty cents seized on or about March 5, 2014 from Bank of America account 5201745022, held in the name of Josdan Home Health Care Inc.;

f.     Ninety-one thousand six hundred thirty-nine dollars and thirty-seven cents seized on or about March 5, 2014 from JP Morgan Chase Bank account 713560910, held in the name of Pathways Home Health Services LLC;

g.     One million five hundred seventy-two thousand nine hundred six dollars and eighty-eight cents seized on or about March 5, 2014 from Pershing Advisor Solutions LLC investment account number AUG-709598, held in the name of First USA Finance and Investment Inc.; and

h.     One million four hundred thirty-eight thousand fifty dollars and no cents seized on or about April 24, 2014, resulting from the sale of Facebook shares held in

Computershare account number C0000017621, in the name of First USA Finance

and Investment.

Vehicles

i.   A 2009 Mercedes-Benz GL320, VIN 4JGBF25E89A498040, seized on or about

March 5, 2014;

j.   A 2010 Land Rover Range Rover, VIN SALSH2E41AA231602, seized on or

about March 16, 2014; and

k.   A 2007 BMW X5, VIN 5UXFE43517LY83916, seized on or about March 18,

2014, and any proceeds resulting from the sale of such vehicle.

Real Property

l.   $425,967.24 in proceeds from the sale of real property located at 6430 N.

Longmeadow, Lincolnwood, Illinois, and legally described as:

THE NORTHEASTERLY 80 FEET OF LOTS 3, 4, AND 5, TAKEN AS A
TRACT IN LINCOLN TOWER'S EIGHTH ADDITION SUBDIVISION OF
THE NORTHWESTERLY HALF OF LOT 21 (EXCEPT THE
NORTHWESTERLY 161.50 FEET THEREOF) IN BRONSON'S PART OF
CALDWELL'S RESERVE IN TOWNSHIP 40 AND 41 NORTH, RANGE 12,
EAST OF THE THIRD PRINCIPAL MERIDIAN, (EXCEPT THEREFROM
THE NORTHEAST 33 FEET AND THE SOUTHEAST 33 FEET THEREOF)
AND (EXCEPT THEREFROM THAT PART LYING SOUTH A LINE 50 FEET
NORTH OF THE CENTER LINE OF DEVON AVENUE) IN COOK COUNTY,
ILLINOIS.

PIN: 10-33-427-034-0000

m.   Real property located at 7225 N. Kostner Avenue, Units A and B, Lincolnwood,

Illinois, and legally described as:

UNIT A IN THE 7225 KOSTNER CONDOMINIUM, AS DELINEATED ON
THE PLAT OF SURVEY OF THE FOLLOWING DESCRIBED TRACT OF
LAND: LOTS 11, 12, 13, 14, AND 15 IN BLOCK 1 IN KOSTNER AVENUE
ADDITION TO KENILWORTH HIGHLANDS, A SUBDIVISION OF THE

SOUTH ½ OF THE WEST 10 ACRES OF THE SOUTH 20 ACRES OF THE WEST 80 ACRES OF THE SOUTHEAST ¼ OF SECTION 27, TOWNSHIP 41 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN ALSO THAT PART OF THE WEST ½ OF THE VACATED NORTH AND SOUTH ALLY EAST AND ADJOINING SAID LOTS 11, 12, 13, 14, AND 15 ALSO THAT PART OF THE NORTH ½ OF THE VACATED EAST AND WEST ALLEY LYING SOUTH AND ADJOINING LOT 11 AND SOUTH AND ADJOINING THE SOUTH LINE OF LOT 11 EXTENDED EAST TO THE CENTER LINE OF SAID VACATED NORTH AND SOUTH ALLEY IN BLOCK 1 IN KOSTNER AVENUE ADDITION TO KENILWORTH HIGHLANDS, IN COOK COUNTY, ILLINOIS, WHICH PLAT OF SURVEY IS ATTACHED AS AN EXHIBIT TO THE DECLARATION OF CONDOMINIUM RECORDED MARCH 30, 2010 AS DOCUMENT NUMBER 1008934039, TOGETHER WITH ITS UNDIVIDED PERCENTAGE INTEREST IN THE COMMON ELEMENTS, IN COOK COUNTY, ILLINOIS.

UNIT NUMBER(S) B IN THE 7225 KOSTNER CONDOMINIUM, AS DELINEATED ON A SURVEY OF THE FOLLOWING DESCRIBED TRACT OF LAND: LOTS 11, 12, 13, 14, AND 15 IN BLOCK 1 IN KOSTNER AVENUE ADDITION TO KENILWORTH HIGHLANDS, A SUBDIVISION OF THE SOUTH ½ OF THE WEST 10 ACRES OF THE SOUTH 20 ACRES OF THE WEST 80 ACRES OF THE SOUTHEAST ¼ OF SECTION 27, TOWNSHIP 41 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, ALSO THAT PART OF THE WEST ½ OF THE VACATED NORTH AND SOUTH ALLEY EAST AND ADJOINING SAID LOTS 11, 12, 13, 14, AND 15, ALSO THAT PART OF THE NORTH ½ OF THE VACATED EAST AND WEST ALLEY LYING SOUTH AND ADJOINING LOT 11 AND SOUTH AND ADJOINING THE SOUTH LINE OF LOT 11 EXTENDED EAST TO THE CENTER LINE OF SAID VACATED NORTH AND SOUTH ALLEY IN BLOCK 1 IN KOSTNER AVENUE ADDITION TO KENILWORTH HIGHLANDS. ALL IN COOK COUNTY, ILLINOIS. WHICH SURVEY IS ATTACHED AS EXHIBIT "A" TO THE DECLARATION OF CONDOMINIUM OWNERSHIP RECORDED 3/30/10 AS DOCUMENT NUMBER 1008934039: TOGETHER WITH ITS UNDIVIDED PERCENTAGE INTEREST IN THE COMMON ELEMENTS IN COOK COUNTY, ILLINOIS.

PIN: 10-27-424-046-1001 AND 10-27-424-046-1002; 10-27-424-024-0000 (AFFECTS UNDERLYING PARCEL)

n.   Real property located at 6420 N. Longmeadow, Lincolnwood, Illinois, and legally

described as:

THE SOUTHWESTERLY 80.00 FEET OF THE NORTHEASTERLY 160.0 FEET OF LOTS 3, 4 AND 5, TAKEN AS A TRACT IN LINCOLN TOWER'S EIGHT ADDITION SUBDIVISION OF THE NORTHWESTERLY HALF OF

LOT 21 (EXCEPT THE NORTHWESTERLY 161.50 FEET THEREOF) IN BRONSON'S PART OF CALDWELL'S RESERVE IN TOWNSHIP 40 AND 41 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, (EXCEPT THEREFROM THE NORTHEAST 33 FEET AND THE SOUTHEAST 33 FEET AND THE SOUTHEAST 33 FEET THEREOF) AND (EXCEPT THEREFROM THAT PART LYING SOUTH OF A LINE 50 FEET NORTH OF THE CENTER LINE OF DEVON AVENUE) IN COOK COUNTY, ILLINOIS.

PIN:10-33-427-035-0000

o.  Real property located at 6451 N. Leroy Avenue, Lincolnwood, Illinois, and

legally described as:

LOT 5 EXCEPT THE SOUTHWESTERLY 10 FEET (AS MEASURED AT RIGHT ANGLES TO THE SOUTHERLY LINE OF LOT 5) IN LINCOLNWOOD TOWERS 5TH ADDITION, BEING A SUBDIVISION OF PART OF LOT 22 IN BRONSON'S PART OF CALDWELLS RESERVE IN TOWNSHIPS 40 AND 41 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

PIN: 10-33-427-011-0000

p.  Real property located at 2220 Valencia Dr. Unit 27D, Northbrook, Illinois and

legally described as:

UNIT 27D2220V IN VILLAS SALCEDA- PHASE I CONDOMINIUM, AS DELINEATED ON THE SURVEY OF THE FOLLOWING DESCRIBED PARCEL OF REAL ESTATE (HEREINAFTER REFERRED TO AS "PARCEL"):

CERTAIN LOTS, OR PORTIONS THEREOF, OF LA SALCEDA SUBDIVISION, A SUBDIVISION OF THE NORTH 1/2 OF SECTION 21, TOWNSHIP 42 NORTH, RANGE 12, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED JANUARY 16, 1973 AS DOCUMENT NUMBER 22188817, IN COOK COUNTY, ILLINOIS;

WHICH SURVEY IS ATTACHED AS EXHIBIT "A" TO THE DECLARATION OF CONDOMINIUM OWNERSHIP AND OF EASEMENTS, RESTRICTIONS AND COVENANTS AND BY-LAWS FOR VILLAS SALCEDO PHASE I CONDOMINIUM MADE BY AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, AS TRUSTEE

UNDER TRUST NUMBER 25933, RECORDED IN THE OFFICE OF THE RECORDER OF DEEDS, COOK COUNTY, ILLINOIS, AS DOCUMENT NUMBER 22637494; TOGETHER WITH ITS UNDIVIDED PERCENTAGE INTEREST IN THE COMMON ELEMENTS AS SET FORTH IN SAID DECLARATION, IN COOK COUNTY, ILLINOIS.

PIN: 04-21-200-051-1027

Cashier's Check

q.　　Cashier's check number 657300, issued by North Shore Community Bank and made payable to individual M.T. in the amount of one hundred sixty-seven thousand four hundred eighty-nine dollars and twenty-two cents, seized on or about March 5, 2014.

5.　　If any of the property described above, as a result of any act or omission of the defendants:

i.　　cannot be located upon the exercise of due diligence;

ii.　　has been transferred or sold to, or deposited with, a third party;

iii.　　has been placed beyond the jurisdiction of the Court;

iv.　　has been substantially diminished in value; or

v.　　has been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek to forfeit any other property of the defendants up to the value of the forfeitable property described above.

A TRUE BILL:

_____

FOREPERSON

_____

UNITED STATES ATTORNEY


_____

UNITED STATES DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION
DEPUTY CHIEF

48